**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **SAMANTHA JONES,** ***individually and on behalf of all others similarly situated,*** | ) | **Case No. 4:26-cv-00810-MAL** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| **HAIN CELESTIAL GROUP, INC., and DOES 1 through 10,** | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Samantha Jones, individually and on behalf of all others similarly situated, hereby files this, Plaintiffs' First Amended Complaint, against Hain Celestial Group ("Defendant" or "Hain") and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products constituting breach of warranty, breach of implied contract, and unjust enrichment, and violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

1. Defendant markets and sells consumer products, including the "Sensible Portions"-branded, Veggie Puffs or Veggie Straws that prominently display on the front of the packaging that the products contain "No Artificial Flavors or Preservatives," but nonetheless contain citric acid – a well-known artificial preservative in food (collectively, the "Products").

2. Because of the presence of citric acid, the claim "No Artificial … Preservatives" is false.

3. Examples of the Products' packaging, prominently stating the "No Artificial Flavors or Preservatives" claims are shown below:



















As shown, the Product prominently states, under the flavor of each variety, that the Products contain "**No Artificial Flavors or Preservatives**."

4. Nonetheless, despite prominently claiming that the Products contain "No Artificial Flavors or Preservatives," the fine-print ingredients reveal that the Products contain citric acid, which (unbeknownst to the reasonable consumer) is an artificial preservative used in food products:

**Apple Straws Variety:**




**Veggie Straws Zesty Ranch Variety:**




**Veggie Puffs Pizza Variety:**




5. Despite the Products containing the known artificial preservative citric acid, Defendants claim they have "No Artificial Flavors or Preservatives" to appeal to consumers who expect a premium product free from artificial preservatives.

6. For all these reasons – and those set forth further below – representing that the Products have "No Artificial Flavors or Preservatives" is false, misleading and deceptive.

7. Pursuant to the MMPA, such practice is illegal.[1]

8. In addition, and/or in the alternative to the above, since the initial offering of the Products, each and every package of the Products has borne a uniformly-worded label falsely claiming the Products contain "No Artificial … Preservatives." Those uniformly-worded false statements give rise to additional and/or alternative claims under Missouri law.

## I. <u>PARTIES, JURISDICTION, AND VENUE</u>

9. Plaintiff Samantha Jones is a citizen and resident of St. Louis County, Missouri.

10. Plaintiff brings this First Amended Class Action Complaint individually and on behalf of a putative class of Missouri residents.

11. Defendant Hain Celestial Group, Inc., is a corporation having its principal place of business in Hoboken, New Jersey. Defendant Hain can be served at: 221 River Street, 12th Floor, Hoboken, NJ 07030.

12. The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged

[1] In making these claims, Plaintiff follows the robust precedent established by state and federal courts throughout the country repeatedly having found that nearly identical claims are not only meritorious, but are appropriate for class treatment. *See, e.g., Sinatro v. Welch Foods, Inc.,* 22-cv-07028 (N.D. Cal. May 22, 2023)(denying dismissal of similar claims; case resolved on class basis); *Prescod v. Celsius Holdings, Inc.*, Case No. 19STCV09321 (L.A.S.C. Aug. 8, 2021) (certifying as a class action a case involving beverages containing citric acid falsely labeled as having "No Preservatives" and resulting in a $7.8M class-wide settlement preliminary approved in its companion case in the Southern District of New York); *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103 (S.D. Cal. 2021) (denying motion to dismiss a "no preservatives" mislabeling claim where the products contained citric acid); *In re Coca-Cola Prods. Mktg. & Sales Practices Litig. II*, No. 14-md-02555-JSW, 2016 U.S. Dist. LEXIS 66266 (N.D. Cal. May 19, 2016) (denying defendant's motion for summary judgement as to "No Preservatives" mislabeling claims where the products contained the preservative phosphoric acid); *Cabrega v. Campbell Soup Co.*, No. 18-CV-3827(SJF)(ARL), 2019 U.S. Dist. LEXIS 245320 (E.D.N.Y. Nov. 18, 2019) (denying in part motion to dismiss "no preservatives" mislabeling claims where the product contained citric acid); *Ashour v. Ariz. Beverages United States LLC*, 2022 U.S. Dist. LEXIS 193603 (S.D.N.Y. Oct. 24, 2022) (denying motion to dismiss "No Preservatives" mislabeling claims where beverages contained citric acid).

herein. If necessary, Plaintiff will seek leave of Court to amend the Petition to reflect the true names and capacities of the DOE Defendants when such identities become known.

13. Defendants, directly and through their agents, have substantial contacts with, and receive substantial benefits and income from and through the State of Missouri. Defendants are the owners, manufacturers, and distributors of the Products, and the entities that created and/or authorized the false, misleading, and deceptive packaging of the Products.

14. Venue is proper in this Court because Plaintiff was injured in this venue and lives within this venue.

15. This asserted class action comports with Federal Rule of Civil Procedure 23 and R.S.Mo. § 407.025(3) of the MMPA. Plaintiffs' identities can be ascertained from Defendant's records, but are so numerous that simple joinder of all individuals is impracticable. This action raises questions of law and fact common among Plaintiffs. The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

16. <u>Class definitions</u>: Plaintiff brings this action on behalf of Plaintiff and a class of similarly-situated persons preliminarily-[2]defined as follows: All persons who purchased the Products[3] in the State of Missouri. The Class Period begins five years prior to the date of the filing of this First Amended Complaint and ceases upon the date of the filing of this Complaint. Excluded from the Class are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i)

---

[2] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification.
[3] As that term and label is defined herein.

who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

17. Numerosity: Upon information and belief, the Class includes at least tens-of-thousands of individuals on a multiple-state basis, making their individual joinder impracticable. Although the exact number of Class members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendants' records.

18. Typicality: Plaintiff's claims are typical of those of the Class because all Plaintiffs were injured by the Defendants' uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Products to Plaintiffs.

19. Adequacy: Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class members Plaintiff seeks to represent, Plaintiff has retained competent and experienced counsel, and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be protected fairly and adequately by Plaintiff and his counsel.

20. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Products; (b) whether and to what extent the Class members were injured by Defendant's illegal conduct; (c) whether the Class members are entitled to compensatory damages; (d) whether the Class members are entitled to declaratory relief; and (e) whether the Class members are entitled to injunctive relief.

21. Superiority: This class action is appropriate for certification because class proceedings are

superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful conduct. Thus, it would be extremely difficult for the individual Class members to obtain effective relief. A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

## PLAINTIFF'S CLAIMS

22. Because the Products all contain citric acid, an artificial preservative, the Products' "No Artificial Flavors or Preservatives" claims are false, misleading and deceptive, all in violation of the Missouri Merchandising Practice Act.

23. Although it is well-established scientifically (and in the various other manners set forth *infra*), the reasonable consumer does not recognize citric acid as a preservative, or as artificial.

24. Plaintiff and other consumers purchased the Products due to their belief that the Products have "No Artificial Flavors or Preservatives."

25. Indeed, as shown *supra,* those statements are prominently advertised on the Products' packaging. Examples are shown below:



















26. Plaintiff and the Class made their purchasing decisions in reliance upon Defendant's advertised claims that the Products contain "No Artificial Flavors or Preservatives."

27. Plaintiff and the Class reasonably and detrimentally relied upon the Products' labels in this respect.

28. This is especially true in light of the fact that the average consumer spends less than 20 seconds making any individual in-store purchasing decision.[4] Indeed, most consumers shop in a relatively hurried fashion, and cannot stop to closely analyze every single product to decipher every deception.[5]

29. Under these circumstances, the prominent claim that the Product contains "No Artificial Flavors or Preservatives," is noticeable to a reasonable consumer. Yet the claim is false because citric acid

---

[4] Randall Beard, *Make the Most of Your Brand's 20-Second Window*, NIELSEN (Jan. 13, 2015), https://www.nielsen.com/us/en/insights/article/2015/make-the-most-of-your-brands-20-second-windown/ (citing *Shopping Takes Only Seconds… In-Store and Online*, EHRENBERG-BASS INSTITUTE OF MARKETING SCIENCE (2015)) (last visited Sept. 14, 2025).

[5] *See, e.g.*, *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 481 (7th Cir. 2020) (stressing that reasonable consumers, in purchasing "everyday" items such as "low-cost groceries," are likely to exhibit a low degree of care); *Danone, US, LLC v. Chobani, LLC,* 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("[A] parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow, is not likely to study with great diligence the contents of a complicated product package, searching for and making sense of fine-print disclosures . . . . Nor does the law expect this of the reasonable consumer.").

is an artificial preservative and the fine-print ingredient boxes on the other side of the Products reveal that they contain citric acid:

**Apple Straws Variety:**




**Veggie Straws Zesty Ranch Variety:**




**Veggie Puffs Pizza Variety:**




30. In light of the ingredient being buried in fine-print, many reasonable consumers will completely overlook it. In any event, citric acid is a synthetic preservative, being categorized as such by multiple governmental, scientific, and academic institutions considering the question.

***Citric Acid Is a Synthetic Preservative***

31. Citric acid is a synthetic, non-natural ingredient. Commercial food manufacturers, including Defendant, use a form of citric acid that is industrially manufactured rather than extracted from

fruit.[6]

32. Virtually all citric acid used in commercial food products is produced through industrial fermentation of carbohydrate substrates by the black mold *Aspergillus niger* (or, less commonly, Candida yeasts). This process is followed by chemical purification steps. Natural extraction from citrus fruits has been almost entirely replaced since the early twentieth century because it is prohibitively expensive, seasonally limited, and incapable of meeting commercial demand. [7]

33. The industrial fermentation process occurs under controlled, large-scale conditions that do not occur in nature. The resulting citric acid is a commercially manufactured food additive. Defendant, as a large-scale manufacturer that produces the Products at its own facilities (including Mountville, Pennsylvania) and through co-packers, uses this standard commercial manufactured form of citric acid. Natural extraction of citric acid directly from citrus fruits is not commercially viable or used in practice for large-scale production of snack food products like the Products. Such extraction is prohibitively expensive, subject to seasonal and supply limitations from agriculture, inconsistent in quality and

---

[6] A. Hesham, Y. Mostafa & L. Al-Sharqi, *Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates*, 48 MYCOBIOLOGY 122, 123 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/

[7] Virtually all commercial citric acid is produced by microbial fermentation using *Aspergillus niger*. *See, e.g.,* "An overview of key industrial product citric acid production by *Aspergillus niger* and its application," Latif, A., Hassan, N., Ali, H., et al., Journal of Industrial Microbiology and Biotechnology (2025) (noting *A. niger* is the primary industrial production organism); "How Citric Acid Is Made: Fermentation, Mold Myths, and Safety," Grand Ingredients (2025) ("essentially all commercial citric acid comes from this process" and that fermentation replaced citrus extraction almost entirely by the 1920's because it is dramatically cheaper and more scalable), *available at*: https://grandingredients.com/how-citric-acid-is-made-fermentation-safety; Market.us, Citric Acid Market Size, Share (2026 update) (fermentation-based production accounts for approximately 92.8% or more of the market), *available at*: Market.us, Citric Acid Market Size, Share | CAGR of 4.1% (updated July 8, 2026), available at: https://market.us/report/citric-acid-market/; see also, *id*; Pau Loke Show, *et al*., *Overview of citric acid production from Aspergillus niger,* FRONTIERS IN LIFE SCIENCE, 8:3, 271-283 (2015), *available at* https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653 *see also,* Belen Max, et. al., *Biotechnological Production of Citric Acid,* Brazilian Journal of Microbiology, 41.4 Sao Paolo (Oct./Dec. 2010).

concentration, and incapable of meeting the high-volume, consistent, and cost-efficient requirements for nationwide commercial distribution of extruded and puffed snack products. There is no economically feasible or commercially available alternative source of citrus-extracted citric acid for products of this type and volume. Accordingly, the citric acid contained in the Products is the industrially manufactured form produced through microbial fermentation using Aspergillus niger.[8]

34. Plaintiff alleges, based on the overwhelming commercial reality of citric acid production and the absence of any viable alternative, that the citric acid in the Products is manufactured through this industrial *Aspergillus niger* fermentation process.[9]

35. Unlike naturally extracted citric acid from citrus fruits, the manufactured citric acid in the Products is produced through extensive industrial chemical processing and purification under controlled large-scale conditions that do not occur in nature. This process results in a product that, while sharing the same core molecular structure, is associated with distinct properties and effects not present in natural citric acid, including potential inflammatory or adverse reactions in consumers (such as joint pain with swelling and stiffness, muscular and stomach pain, and shortness of breath) linked to the industrial production method.[10] As a result, the manufactured citric acid is "artificial" and "synthetic" within the ordinary

---

[8] Defendant manufactures the Products at its own facilities, including the Mountville, Pennsylvania plant, and through co-packers. See The Hain Celestial Group, Inc., Form 10-K for the fiscal year ended June 30, 2025, at 8 (describing the Mountville, Pennsylvania facility as producing Garden Veggie and Sensible Portions snack products), available at: https://www.sec.gov/Archives/edgar/data/910406/000119312525203534/hain-20250630.htm. Natural citrus extraction is not commercially viable at the scale required for these products. See sources cited fn. 7 *supra.*

[9] *See, Hayes v. Kraft Heinz Co.,* No. 1:23-cv-16596, 2024 WL 4766319, at *3–4 (N.D. Ill. Nov. 13, 2024) (allegations supported by industry data showing that over 90%–99% of commercial citric acid is produced via *Aspergillus niger* fermentation provided a sufficient connection to the defendant's practices).

[10] Iiana E. Sweis et al., Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports, 5 Toxicol. Rep. 808 (2018).

meaning and reasonable consumer understanding of those terms—particularly for consumers seeking "better-for-you" or clean-label snacks marketed with prominent "No Artificial Flavors or Preservatives" claims. A reasonable consumer would not expect or understand industrially manufactured citric acid produced via mold fermentation and chemical processing to be included in products labeled as containing no artificial preservatives.[11]

36. Although citric acid produced by microbial fermentation is sometimes classified as "non-synthetic" under certain USDA organic standards, that technical classification does not control the meaning of "artificial" to a reasonable consumer.

37. Reasonable consumers understand the claim "No Artificial Flavors or Preservatives" to mean the product does not contain industrially manufactured additives produced through large-scale fermentation and chemical processing. The citric acid in the Products is such an additive.

38. The Food and Drug Administration ("FDA"), which has primary authority to establish labeling requirements for foods and food ingredients under its purview pursuant to the FDCA,[12] has for decades identified citric acid as being a synthetic ingredient.

39. As just one example, the FDA's classification of citric acid as a synthetic ingredient is confirmed by its warning letter, dated October 29, 2001, to Hirzel Canning Company ("Hirzel") regarding its canned tomato products. *See* **Exhibit B**. Therein, the FDA stated that these products could not bear an "all natural" claim on the label because the products contained a synthetic ingredient, citric acid.

---

[11] *See Hayes v. Kraft Heinz Co.,* 2024 WL 4766319, at *3–4 (N.D. Ill. Nov. 13, 2024) (allegations of Aspergillus niger production history, industry dominance of manufactured citric acid, chemical/functional differences, and preservative function were sufficient to survive a motion to dismiss); *Delvalle v. Coca-Cola Co.,* 2025 WL 1489257 (S.D.N.Y. May 23, 2025) (specific allegations that citric acid functions as a preservative and FDA guidance were sufficient regardless of defendant's claimed intent); *Ward v. Pepperidge Farm, Inc.,* No. 1:24-cv-00078 (S.D.N.Y. 2025) (same).

[12] 21 U.S.C. § 301, *et. seq.*

40. Specifically, the letter states, in pertinent part:

> [A]ccording to the ingredients statements … citric acid are added to the products … FDA's policy regarding the use of "natural" means that nothing artificial or synthetic has been included, or has been added to, a food that would not normally be expected to be in the food. Therefore, *the addition of … citric acid to these products preclude the use of the term "natural" to describe this product*."

Exhibit B (emphasis added).

41. Because the Hirzel products contained a synthetic ingredient (citric acid), preventing the products from bearing a "natural" claim, the FDA informed Hirzel that the products were misbranded. In short, the FDA clearly deemed citric acid as an artificial, synthetic ingredient.

42. Similarly, on August 16, 2001, the FDA sent Oak Tree Farm Dairy, Inc. a warning letter regarding its "Oaktree Real Brewed Iced Tea," and other products. *See* **Exhibit C.** With respect to the Iced Tea product, the FDA stated that the product could not bear "100% Natural" and "All Natural" claims on the label because the product contained a synthetic ingredient, citric acid.

43. Specifically, the letter states, in pertinent part:

> "[t]*he term "all natural"* on [a separate product] *is inappropriate* because the product contains sodium sorbate … FDA's policy regarding the use of "natural" means that nothing artificial or synthetic has been included, or has been added to, a food that would not normally be expected to be in the food. The same comment applies to the use of the terms "100% Natural" and "All Natural" on the [Iced Tea product] *because it contains citric acid*.

Exhibit C, (emphasis added).

44. As the above makes clear, the FDA, consistent with many other sources, has repeatedly recognized that citric acid added to food products is synthetic and artificial. Likewise, a plethora of sources recognize that citric acid also necessarily functions as a preservative.

45. Citric acid functions as a preservative when added to food products, including the Products here, regardless of its intended use. The FDA defines a preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof

to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5). The FDA has listed citric acid as a preservative in its "Overview of Food Ingredients, Additives and Colors" as shown below:[13]

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| **Preservatives** | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

46. As shown, under the "What they Do" table heading, the FDA states that preservatives help "prevent food spoilage from bacteria, molds, fungi or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); [and] maintain freshness."

47. Indeed, the FDA warned companies broadly, well over a decade ago, that citric acid is a preservative. Like the artificiality of citric acid, its classification as a preservative has been settled for quite a while. In a 2010 warning letter sent to Chiquita Brands International, Inc. and Fresh Express, Inc., the FDA warned that certain products were misbranded under the Federal Food Drug and Cosmetics Act because they "contain the *chemical preservatives ascorbic acid and citric acid* but their labels fail to declare these *preservatives* with a description of their functions. 21 C.F.R. [§] 101.22" (emphasis added).[14]

48. Around the same time, in April of 2010, the International Food Information Council ("IFIC"), acting in conjunction with the FDA, issued a public bulletin informing consumers wanting to avoid

---

[13] *Overview of Food Ingredients, Additives & Colors,* FOOD AND DRUG ADMINISTRATION, *available at* https://web.archive.org/web/20220901032454/http://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors

[14] *See* **Exhibit A** attached hereto.

preservatives to check if the food's ingredients include the chemical additives of "[a]scorbic acid [and] citric acid," which the IFIC and FDA designate as a *preservative.*"[15]:

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| Preservatives | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erytho sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

49. Citric acid has antioxidant and antimicrobial properties. Citric acid acts as an antioxidant via two processes—inhibiting enzymes and chelating metals. Certain enzymes naturally exist in food products that oxidize and breakdown the food products' molecules. Citric acid deactivates these enzymes, thereby functioning as a preservative.[16] Citric acid also chelates metal ions, which stabilizes and preserves food products by bonding certain molecules in food products to centrally located metal atoms.[17]

50. The Encyclopedia Britannica also classifies citric acid as a preservative because it has antioxidant properties, as illustrated below:[18]

## Preservatives

Food preservatives are classified into two main groups: antioxidants and antimicrobials. Antioxidants are compounds that delay or prevent the deterioration of foods by oxidative mechanisms. Antimicrobial agents inhibit the growth of spoilage and pathogenic microorganisms in food.

| Food preservatives | |
|---|---|
| **chemical agent** | **mechanism of action** |
| **Antioxidants** | |
| ascorbic acid | oxygen scavenger |
| butylated hydroxyanisole (BHA) | free radical scavenger |
| butylated hydroxytoluene (BHT) | free radical scavenger |
| citric acid | enzyme inhibitor/metal chelator |

[15] IFIC and FDA, April 2010 Bulletin: "Overview of Food Ingredients, Additives & Colors, at pp. 2-3, available at: https://www.fda.gov/files/food/published/Food-Ingredients-and-Colors-%28PDF%29.pdf
[16] *Id.*
[17] P. Davidson et al., *Chapter 20: Antimicrobial Agents*, in FOOD ADDITIVES, at 592 (A. Larry Branen et al. eds., Marcel Dekker, Inc. 2d ed. 2002).
[18] *Preservatives*, BRITANNICA, *available at* https://www.britannica.com/topic/food-additive/Preservatives#ref502211

51. In addition to its antioxidant properties, citric acid also has antimicrobial properties and directly inhibits the growth of some bacteria and mold.[19] This is another, independent reason why food scientists classify citric acid as a preservative.[20]

52. The Agricultural Marketing Service of the United States Department of Agriculture ("USDA") has also recognized the use of citric acid as a preservative stating that "Citric acid has a wide variety of uses, some of which can provide preservative functions, primarily though lowering the pH of the food."[21]

53. The USDA's Food Safety Inspection Service's "Guideline for Label Approval" states that "[s]ome common chemical preservatives include BHA, BHT, calcium propionate, citric acid, natamycin and sodium propionate."[22]

54. In addition, several academic journals also note the use of citric acid as a preservative.[23] In fact, "[C]itric acid acts as a preservative in many processed foods; keeping them fresh. It does this by slowing or helping prevent the formation of bacteria, mold, yeast, and fungus."[24] "Today, citric acid is

---

[19] L. Su et al., *Study on the Antimicrobial Properties of Citrate-Based Biodegradable Polymers*, FRONTIERS IN BIOENGINEERING AND BIOTECHNOLOGY, 2, 23. https://doi.org/10.3389/fbioe.2014.0002

[20] *Citric Acid Compound Summary*, NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://pubchem.ncbi.nlm.nih.gov/compound/Citric-acid.

[21] *Citric Acid and Salts*, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at* https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[22] FSIS Guideline for Label Approval, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at* https://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-GD-2023-0001.pdf

[23] K. Kirimura, et al., *Citric Acid*, COMPREHENSIVE BIOTECHNOLOGY (SECOND EDITION) (2011), *available at* https://www.sciencedirect.com/science/article/abs/pii/B9780080885049001690?via%3Dihub; K.M.S. Islam, *Use of citric acid in broiler diets,* WORLD'S POULTRY SCIENCE JOURNAL VOL. 68, ISSUE 1 (Feb. 21, 2012), *available at* https://www.cambridge.org/core/journals/world-s- poultry-science -journal/article/abs/use-of-citric-acid-in-broiler-diets/DA15C2C1F90667525BF2414DF3BFF646 ("Citric Acid (CA) is a weak organic acid which is a natural preservative and can add an acidic or sour taste to foods and soft drinks.").

[24] *What is citric acid, and what is it used for?,* MEDICAL NEWS TODAY (July 23, 2021), *available at* https://www.medicalnewstoday.com/articles/citric-acid

one of the most common and widely-used preservatives in the world[.]"[25]

***Citric Acid Necessarily Functions as a Preservative in the Products***

55. It is not necessary that the citric acid in the Products function as a preservative for the "No Artificial Flavors or Preservatives" claim to be false, because the mere inclusion of an artificial preservative renders the claim false. Nonetheless, the citric acid does function as a preservative in the Products. The Products contain vegetable powders and starches, oils (including canola and/or sunflower oil), and other ingredients susceptible to oxidation, rancidity, enzymatic browning, and microbial growth. In these Products, citric acid functions as a preservative by lowering pH to inhibit bacteria, molds, and yeasts; chelating metal ions that catalyze oxidative reactions and lipid peroxidation in the oils; and otherwise tending to prevent or retard deterioration, regardless of Defendant's subjective intent or primary purpose for adding it (e.g., as a flavoring agent or acidulant). These preservative effects occur in the Products irrespective of the quantity used or Defendant's claimed intent.

56. Citric acid functions as a preservative even if it is also added to the Products for some other use. *See* 21 C.F.R. § 101.22(a)(5)(defining preservatives as "any chemical that, when added to food, *tends to* prevent or retard deterioration")(emphasis added); *see also* Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or *has the power of preserving*.")(emphasis added);[26] Oxford English Dictionary (defining "preservative" as "[t]ending to preserve or *capable* of preserving").[27]

57. Indeed, subjective intent of citric acid use is irrelevant. Citric acid functions as a preservative in the Products, and this is true regardless of Defendant's subjective purpose or intent for

---

[25] *Citric Acid: One of the Most Important Preservatives in The World,* FBC INDUSTRIES, INC. (Feb. 5 2019), *available at* https://fbcindustries.com/citric-acid-one-of-the-most-important- preservatives-in-the-world/

[26] *Preservative,* MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/preservative?utm_campaign=sd&utm_medium=serp&utm_source=jso nld

[27] *Preservative*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=preservative.

adding it to the Products, such as to impart flavor.[28]

58. In addition to the above reasons establishing that citric acid is an artificial preservative, the following points also cement this understanding, and show how citric acid necessarily functions as an artificial preservative in the Products. The following points also further illustrate why Defendant's purported intended use of citric acid is irrelevant. Regardless of intended uses, citric acid *necessarily* and *unavoidably* tends to, has the power to, and is capable of acting as a preservative.

a. Because citric acid lowers the pH of food, it helps to create an acidic environment that inhibits the growth of microorganisms, thereby acting as a preservative.[29]

b. As noted, citric acid also has an antioxidant effect, which prevents oxidation and spoilage of food products, and thereby acts as a preservative in this manner as well.[30]

c. Citric acid also promotes antimicrobial activity, such that it also prevents the growth of bacteria, molds, and yeasts in food products, thus acting as a preservative.[31]

d. Citric acid also has chelating properties, so that it can bind to metal ions, such

---

[28] *Citric Acid* in KIRK-OTHMER FOOD & FEED TECH., at 262 (John Wiley & Sons, 2007); L. Somogyi, *Chapter 13: Direct Food Additives in Fruit Processing,* in PROCESSING FRUITS: SCI. & TECH., at 302 (D. Barrett et al. eds., CRC Press 2d ed. 2004); M. Abd- Elhady, *Effect of citric acid, calcium lactate and low temperature prefreezing treatment on the quality of frozen strawberry*, 59 ANNALS OF AGRIC. SCIS., 69-75 (2014); J. deMan, *Chapter 11: Additives and Contaminants*, in PRINCIPLES OF FOOD CHEMISTRY, at 438 (AVI Publishing Co., Inc. 3d ed. 1999).

[29] *See, e.g.,* ECHEM.COM "Is Citric Acid a Preservative: A Complete Guide, June 8, 2023, available at https://www.echemi.com/cms/1416389.html

[30] *See, e.g.,*Medical News Today, "What is citric acid, and what is it used for?", July 23, 2021, available at: https://www.medicalnewstoday.com/articles/citric-acid

[31] *See, e.g.,* NIH, National Library of Medicine, C. Burel "Impact of pH on citric acid antimicrobial activity against Gram-negative bacteria," Nov. 22, 2022, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7984346/

as iron and copper, which are involved in catalyzing oxidative reactions that lead to food spoilage. As such, it acts as a preservative in this additional manner.[32]

e. Citric acid can also help retain moisture in products, thereby reducing the risk of microbial growth due to water availability – this is yet one more fashion in which citric acid acts as a preservative.

f. Citric acid also has a direct affect as a mold inhibitor, making it an effective preservative for this addition reason.[33]

59. In addition, and perhaps most importantly, while citric acid can also be employed by a manufacturer that intends to impart taste, a greater quantity of citric acid is required to impart taste than to preserve foods.[34] The preservative effects of this acid may be reduced at lower levels, but it will still be present.

60. Thus, Defendant cannot argue that it includes citric acid in the Products merely to impart taste, because the quantities required to impart taste are more than sufficient to function as a preservative. And, as stated, to the extent the citric acid imparts taste, it renders false the "No Artificial … Flavors" claim.

61. For all of the above–stated reasons, and more, it is clear that citric acid is an artificial preservative, regardless of what its intended or subjective use is in the Products is claimed to be. Moreover, even if citric acid's function as a preservative in the Product were somehow otherwise negated

---

[32] *See, e.g.,* ScienceDirect, "Rancidity, Impact of particle size and other ingredients on extrude foods and feeds,'" Mian N. Riaz, 2012, available at: https://www.sciencedirect.com/topics/agricultural-and-biological-sciences/rancidity

[33] *See, e.g.,* NIH, National Library of Medicine, Musyoka, Joyce, "Effects of acidification and preservatives on microbial growth during storage of orange fleshed sweet potato puree.", June 7, 2018, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6011086/

[34] *See, e.g.,* Sweis, Illiani, fn. 9, *supra.*

or counteracted (which is not apparent here), the "No Artificial Flavors or Preservatives" label is nonetheless false.

62. In short, the mere inclusion of citric acid in the Product, regardless of any other excuse or explanation created by Defendant, renders the "No Artificial Flavors or Preservatives" label false.

***Reasonable Consumers are Deceived by Defendant's False Labeling***

63. Consumers, like Plaintiff, rely on Defendant's "No Artificial Flavors or Preservatives" labeling statements. That statement is material to reasonable consumers. "[F]oods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health … 84 percent of American consumers buy free-from foods because they are seeking out more natural or less processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims "free-from" consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent).[35]

64. Moreover, up to 70% of consumers say they're willing to pay a premium for food products in the natural, ethical, enhanced or "less of…" categories.[36]

65. In yet another study, the consumers spoke loud and clear in pointing out that a product having "no artificial ingredients" is specifically sought after by a full 69% of consumers, followed closely by "no preservatives" at 67% (see excerpt below):[37]

---

[35] *84% of Americans buy "free-from" foods because they believe them to be more natural or less processed*, Mintel (Sept. 3, 2015), *available at* https://www.mintel.com/press-centre/84-of- americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed/

[36] *See* Consumer Health Claims 3.0 The Next Generation of Mindful Food Consumption, available at https://www.lek.com/insights/ei/next-generation-mindful-food-consumption (last visited September 10, 2024).

[37] LEK Consulting, Executive Insights; Steingoltz, Maria, *et. al.,* "Consumer Health Claims 3.0: The Next Generation of Mindful Food Consumption," 2018, available at: https://www.lek.com/sites/default/files/insights/pdf-attachments/2051-Healthy-Food-Claims.pdf




66. Clearly, consumers are overwhelmingly concerned with having "no artificial ingredients," including "no artificial preservatives," and strongly prefer healthy food products. *Id.* And this trend is only increasing, as the global sale of healthy food products is estimated to be $4 trillion dollars and is forecasted to reach $7 trillion by 2025.[38]

67. Defendant's conduct threatens Missouri consumers by using false, deceptive, and misleading labels. Defendant's conduct also threatens other companies, large and small, who "play by the rules." Defendant's conduct stifles competition, has a negative impact on the marketplace, and reduces consumer choice.

68. There is no practical reason for the false or misleading labeling and advertising of the Products, other than to mislead consumers as to the actual nature of the Products, while simultaneously providing Defendant with a financial windfall.

***Allegations Relating to All Plaintiffs***

69. As noted, *supra,* since the initial offering of the Products, in prominent positions on the

---

[38] Global Wellness Institute, *The Global Wellness Economy Stands at $4.4 Trillion Amidst the Disruptions of COVID-19; Is Forecast to Reach $7 Trillion by 2025*, https://www.hospitalitynet.org/news/4108643.html.

packaging of the Products, they have borne one or more uniformly-worded labels falsely claiming the Products contain "No Artificial Flavors or Preservatives" (hereinafter "False Claims").

70. In reality, for all the reasons set forth *supra,* a reasonable consumer would find that the False Claims are false, misleading, unfair, and/or deceptive.

71. Defendant, as developer, manufacturer, and exclusive seller and distributor of the Products, has been aware since the Products' inception, that the False Claims are in fact false.

72. Indeed, Defendant undoubtedly did its own investigation of the Products and its marketplace prior to them being offered for sale and, of necessity, such investigation would have made Defendant aware that the False Claims are in fact false.

73. Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a Product that had "No Artificial Flavors or Preservatives."

74. Plaintiff and the class members purchased the Products without being aware that the Products in fact contain a synthetic and artificial preservative.

75. Defendant possessed specialized knowledge regarding the data and information concerning the Products and their claims.

76. In purchasing the Products, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

77. Had Plaintiff known that the False Claims were false, Plaintiff would not have purchased the Products or would not have paid as much for the Products.

78. If, at some point in the future, the Product was improved to actually have "No Artificial Flavors or Preservatives," and/or otherwise be accurately labeled, Plaintiff intends to, and will purchase the Products again.

79. As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by

Defendant.

80. By marketing, selling and distributing the Product to purchasers in Missouri and elsewhere, Defendant made actionable statements that the Products contained "No Artificial Flavors or Preservatives."

81. Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

82. Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

83. As the distributor, marketer, producer, manufacturer, and seller of the Products, Defendant possessed specialized knowledge regarding the data and information concerning the Product which the Plaintiff and the class members could not and did not review.

*Facts Particular to Named Plaintiff*

84. On or around September 10, 2025, Plaintiff purchased multiple varieties of the Product from a Walmart location in St. Louis County, Missouri.

85. Due to the claims on the packaging, Plaintiff falsely believed Plaintiff was purchasing products that contained "No Artificial Flavors or Preservatives."

86. Plaintiff thereafter purchased the Products. Plaintiff purchased the Products primarily for Plaintiff's personal, family and household use.

87. At the time Plaintiff purchased the Product, Plaintiff was unaware of the falsity of the Products' claims.

88. Plaintiff paid approximately $4.99 for each 14 oz.. bag of the Product, but paid more, approximately $8.99, for the Apple Straws variety, which Plaintiff chose in the midst of multiple other similar products not claiming to have "No Artificial Preservatives."

89. At all times, Plaintiff was acting as a reasonable consumer would under similar circumstances, but was deceived in a manner described herein, a manner that would deceive reasonable consumers.

90. Plaintiff discovered that such claims were false after purchasing and using (ingesting) the Product, which Plaintiff used and prepared properly and according to its instructions in every respect.

91. If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, Plaintiff would not have bought the Product.

92. When Plaintiff purchased the Product, Plaintiff was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

93. Specifically, Plaintiff suffered an ascertainable loss because Plaintiff did not receive the expected benefit of the bargain.

94. When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that Plaintiff was receiving a product that contained "No Artificial Flavors or Preservatives."

95. The Product was not what it was purported to be. Plaintiff did not receive the value of what Plaintiff bargained for; instead Plaintiff received a product that did not live up to one of its most-prominently advertised benefits – containing no artificial preservatives. Plaintiff did not want a Product with artificial preservatives.

96. Consequently, Plaintiff suffered an ascertainable loss. Plaintiff paid a price premium for the Products that was attributable to the false and misleading "No Artificial Flavors or Preservatives" claims. Consumers, including Plaintiff, are willing to pay more for snack products that are free from artificial preservatives and that bear such claims. The false claims were material to Plaintiff's purchasing decision. Had Plaintiff known the claims were false, Plaintiff would not have purchased the Products or would have paid substantially less for them. The difference between the price Plaintiff paid and the actual

value of the Products (or the price Plaintiff would have paid absent the false claims) constitutes Plaintiff's ascertainable loss. This loss is measurable and will be quantified through expert testimony using well-established price-premium and benefit-of-the-bargain methodologies routinely accepted in similar consumer labeling cases.

97. Plaintiff desires to, and will purchase the Products again if they are honestly-labeled in respect to the ingredients within, but faces an imminent threat of harm because Plaintiff will not be able to rely on Defendant's labels in the future (without relief) and will thus be unable to purchase the Products.

98. Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class, all that is relevant is that Plaintiff and the class members purchased the Products at a time within the Class Period while in Missouri.

***Plaintiff's Claims Are Not Preempted***

99. Any claim of "preemption" by Defendant would be misplaced. Plaintiffs' claims are not preempted by the FDCA because the definition of "preservative," as used herein, is identical with that of the FDA (see above).

100. Moreover, FDA regulations specifically note that claims like "No Preservatives" are non-nutritive claims that are not governed by 21 C.F.R. §101.13. *See* 21 C.F.R. § 101.65(b)(2).

101. *A fortiori,* since the FDA has never issued specific standards governing when "No Artificial Preservative[s]" claims are either true or false, such representations fall outside the ambit of FDA regulations. And even if, *arguendo,* they did not fall outside FDA regulations (which they do), Plaintiff's claims are *consistent* with FDA regulations.

102. Accordingly, Plaintiffs' claim cannot possibly be preempted.

## CAUSES OF ACTION

### COUNT ONE: BREACH OF WARRANTY

103. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each

preceding paragraph of this Class Action Petition.

104. Defendant sold the Product in its regular course of business. Plaintiff and the class members purchased the Product.

105. Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims.

106. The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

107. Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

108. Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty under Missouri law and the laws of the Consumer Protection States.

109. Defendant breached the warranty because the False Claims were false; the Product are not ones that contained "No Artificial Flavors or Preservatives."

110. The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

111. All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product.

112. Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

113. Specifically, on October 24, 2025, counsel for Plaintiff mailed a draft copy of this very lawsuit to Defendant, providing Defendant with written notice of its breach of warranty. Defendant has nonetheless taken no action to remedy its breach of express and implied warranty.

114. In addition, Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, *inter alia*, Defendant's knowledge of the Product.

115. Defendant has nonetheless refused to remedy such breaches.

116. By placing the Products in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

117. Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid. As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages.

**COUNT TWO: BREACH OF IMPLIED CONTRACT UNDER MISSOURI LAW**

118. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

119. By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

120. By operation of Missouri law, there existed an implied duty of good faith and fair dealing in each such contract.

121. By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

122. As stated, despite claiming to contain "No Artificial Flavors or Preservatives," the Products all contain citric acid, which is an artificial preservative.

123. As a result of that breach, Plaintiff and each class member suffered damages.

**COUNT THREE: UNJUST ENRICHMENT UNDER MISSOURI LAW**

124. Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if fully set forth herein.

125. Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

126. Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

127. By purchasing the Product, Plaintiff conferred a benefit upon Defendant in that Defendant ultimately received funds from the transaction, initially provided by Plaintiff.

128. Upon information and belief, Defendant directly profits from Plaintiff's purchase in such a manner.

129. Accordingly, Defendant was unjustly enriched by Plaintiff and those similarly-situated.

**COUNT FOUR: VIOLATION OF THE MMPA**

130. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Petition, as though fully set forth herein.

131. Defendant's acts complained of herein occurred in and emanated from the State of Missouri and/or one of the Consumer Protection States.

132. Plaintiff and all members of the Class are "persons" and the Product is "merchandise" as those terms are defined under the MMPA.

133. As set out in this Petition, Defendant's marketing and sale of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA"). The statement "No Artificial Flavors or Preservatives" is false, deceptive, and misleading; and Defendant's overall practice is certainly "unfair."

134. As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing contained "No Artificial Flavors or Preservatives."

135. In being misled in the manner described herein, Plaintiff was at all times acting as a reasonable consumer would in light of the circumstances.

136. The deceptive practice Defendant engaged in would cause a reasonable person to enter the

transaction described herein, which resulted in damages to Plaintiff.

137. Defendant's deceptive acts caused Plaintiff and the Class members an ascertainable loss within the meaning of the MMPA. The false "No Artificial Flavors or Preservatives" claims allowed Defendant to charge, and caused Plaintiff and Class members to pay, a price premium for the Products over comparable products that do not make such claims. The claims were material to the purchasing decisions of Plaintiff and Class members, who reasonably relied on them. As a direct result, Plaintiff and Class members paid more for the Products than they were actually worth, or more than they would have paid had the labels been truthful. This price premium constitutes a concrete and measurable economic loss that can be proven with objective evidence, including expert analysis of market prices, consumer surveys, and standard econometric methods routinely used in false-labeling cases. Accordingly, damages can be established with reasonable certainty.[39]

138. Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

139. Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order certifying this action as a Missouri class action, and appointing Plaintiff as Class representative and her counsel as class and/or subclass counsel. Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned claims; and/or violated the MMPA, and award Plaintiff compensatory damages and attorneys' fees, and such further relief as the Court deems just.

---

[39] As stated, Plaintiffs also will enlist the aid of appropriate expert witnesses to calculate damages.

Respectfully submitted,

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
225 S. Meramec Ave., Suite #325
Clayton, MO 63105
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiffs*